# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 9, 2016 Session

## IN RE: NEYLAN H.

### Appeal from the Circuit Court for Greene County
No. 14A020     Douglas T. Jenkins, Chancellor Sitting By Interchange

---

### No. E2015-02444-COA-R3-PT-FILED-DECEMBER 29, 2016

---

Terri W.H. ("Mother") and Justin H. ("Stepfather") filed a petition seeking to terminate the parental rights of James P. ("Father") to the minor child Neylan H. ("the Child") in order to allow Stepfather to adopt the Child. After a trial, the Circuit Court for Greene County ("the Trial Court") entered its order denying the petition after finding and holding, *inter alia*, that Mother and Stepfather had failed to prove by clear and convincing evidence that Father had abandoned the Child by willful failure to provide support. Mother appeals to this Court. We find and hold that the evidence does not preponderate against the findings made by the Trial Court, and we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed
### Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Douglas R. Beier, Morristown, Tennessee, for the appellant, Terri W.H.

Douglas R. Beier, Morristown, Tennessee, for the appellee, Justin H.[1]

Jefferson B. Fairchild, Rogersville, Tennessee, for the appellee, James P.

---

[1] Stepfather did not join in the notice of appeal, but did file a notice of joinder in Mother's brief pursuant to Tenn. R. App. P. 27(j).

# OPINION

## Background

The Child was born in March of 2012, out of wedlock. Mother, Father, and the Child lived together from July of 2012 until March of 2013. Father moved out of Mother's house one day after the Child's first birthday. In November of 2013, Mother married Stepfather. The Child has lived with Mother and Stepfather since their marriage. In October of 2014, Mother and Stepfather filed a petition seeking to terminate the parental rights of Father to the Child in order to allow Stepfather to adopt the Child. The case was tried without a jury in September of 2015.

Mother testified at trial that she and Stepfather also have a fourteen month old daughter. Mother, Stepfather, their daughter, and the Child live in a house owned by Mother. Mother explained that she had resided in this house for a number of years prior to marrying Stepfather.

Mother testified about her relationship with Father. Mother stated that Father never lived with Mother, but did stay at her home from July of 2012 until March of 2013. When Mother and Father decided to separate, Father moved out because Mother owned the house. The Child was one year old when Father moved out.

According to Mother, Father spent no significant time with the Child during the time that Father lived with them. Mother stated: "During the six months that [Father] stayed with me he stayed in the guest bedroom. He played videogames and he was on his phone all the time. When I went to work my mother would watch [the Child], who lived right up the road." Mother testified:

> [Father] watched [the Child] once while he lived there and that was for a two (2) hour period and then he called my mother to come and get him because his belly hurt. [Father] said that his belly hurt so my mother went down to my house and got him, took him up to . . . . Went down to my house and got [the Child], brought him up to her house.

Mother stated that when she got home on the day "[Father] watched [the Child]" she checked the Child's "bottom and he had a diaper rash so [Father] didn't watch him anymore after that."

Mother testified that Father did not spend any significant time with the Child after March of 2013. She stated that he visited "four to five (5) [times]. And that wasn't long periods." Mother testified that Father visited one more time in October. She stated: "We

2

went to the park. I was there as well. He stayed for forty-five (45) minutes and then left." Mother testified that Father has not seen the Child since that time and that the Child does not know who Father is.

Mother said that Father never gave her any child support and that he did not pay any of the birth expenses or medical bills. Mother testified that she asked Father for support and that he responded by saying "[h]e wasn't going to give me any money." Mother denied that Father provided any money or support for food or bills while they lived together. Mother testified that during that time she was a fulltime student and that she also worked at Flip Zone.

Mother testified about Stepfather's relationship with the Child stating:

[Stepfather] has been involved with [the Child] since we got together. He's never pushed [the Child] aside. He's always taken him in. [The Child] actually started calling [Stepfather] daddy. They have a great relationship. Every time he gets home or home from work they play ball together. If it's wet outside or rainy outside they'll play games inside. And I mean, he just treats him the same way that he treats our daughter.

Mother testified that Stepfather participates in feeding, bathing, and putting the Child to bed. Mother works as a registered nurse. When Mother and Stepfather are working, Stepfather's mother cares for the Child.

Mother acknowledged that she wants Stepfather to adopt the Child. Mother stated:

Because [Stepfather] has been involved with [the Child] more than [Father] has. They have a great relationship. [Stepfather] has provided . . . ever since that we've been together he's provided [the Child] . . . when I was a fulltime student he is the one that provided [the Child], he bought everything that he needed and they have a great relationship together.

Mother testified that she and Stepfather began dating in August of 2013. When questioned further, Mother admitted that she and Stepfather had dated previous to that time and had an on again/off again relationship.

When asked if she had received text messages from Father asking to visit the Child, Mother responded: "I don't remember. . . . I do not have that phone." A transcript was admitted as an exhibit, and Mother admitted that she recognized the transcript as being text messages between her and Father. Mother stated: "Yes sir and it's . . . these

3

are sent late. [The Child's] bedtime is around 8:30 so he knows that he went to bed around that time."

Mother was asked to read one of the texts from Father, and she stated:

"Well just in case you didn't get the message I sent this morning or ignored it I want to see [the Child] when I get off work. Yes or no will be fine." He doesn't get off . . . he didn't get off work until 7:00 so by the time I fed [the Child], bathed him, he would be in bed.

Mother was asked if she responded by finding another time when Father could visit and she stated: "No. Some of these messages I didn't receive." Father texted at 10:59 one morning asking to see the Child, and Mother admitted that the Child would have been up, but stated: "That was a time that I was in school." At 5:42 p.m. on October 4th Father texted and asked if there was a certain time he could see the Child, and Mother testified that her response was "I said no cause I was out of school and off work at that time." Father then texted: "Well ok. Kind of sucks. I would like to see my son though." Father then sent texts on multiple days asking to see the Child. Mother was asked if she responded, and she stated: "Does he have a copy of his work schedule because I know . . . sometimes he was at work when he would text these."

Mother was asked why she had testified that Father only asked for token visitation when Father had sent all of these texts, and she stated: "Every single day how can he see him when he's at work though. He was just doing that to say that he asked." When questioned Mother admitted that Father could not have been asking to see the Child just to show evidence in court because nothing had been filed in court at that time. Mother then stated "But how do you know that these [text messages] even went through to me. You can put this on your phone and not even send it through." Mother was asked if she was alleging that was what happened, and she stated: "I'm saying that I can't recall. I don't have any of those in my possession."

On October 9th Father asked to see the Child, and received no response. On October 10th Father told Mother it had been twenty-eight days since he had been allowed to see the Child. On October 11th Father told Mother that it had been another day since he had been allowed to see his son. Mother stated that her response was: "You can see him anytime you want." Mother allowed Father to see the Child on October 11th for about forty-five minutes at the park. Mother was asked why the visit was at the park, and she stated: "Because I did not want him in my home." Mother was asked why Father was not allowed to pick the Child up and take him for visitation, and Mother stated: "Because the last time he was with him alone it was when he had the dirty diaper and he did not take proper care of him."

4

On October 15th Father asked to see the Child, and Mother responded by asking if he was at work. Father then responded that he wanted to see the Child when he got off of work. Mother responded "He will already be in bed." Mother was asked if she refused to allow Father to have visitation, and she stated: "So did you want me to wake my son up so he can come over and see him?" Father offered to come over and spend some time with the Child until the Child "falls asleep." Mother stated: "Which he knows that he takes his bath around 8:00, 8:30 and goes to bed."

On October 18th Father offered to do visitation at his house or at Mother's, and Mother's response was that they would have to meet in public places. Father asked why they needed to meet in public places, and Mother did not respond. On October 19, 20, 21, and 22, Father asked to see the Child and received no response from Mother. Father sent several texts at the end of October asking if he could take the Child trick-or-treating. Mother did not allow Father to take the Child trick-or-treating. Father continued to send texts on a daily or almost daily basis for several more months[2] asking to see the Child.

Mother admitted that one of the text messages from Father stated that Father would buy the Child what the Child needs. Mother stated: "He says that but he never did. . . . And he never offered after that." Mother admitted that her response to Father's text was that she would get the Child what the Child needed. Father sent another text stating that he had no problem buying things for the Child, and Mother responded stating "I told him that I would get it. He could give me the money and I would get him what he needed. . . . But child support is not only to buy material things. It's also to provide a roof over the head, bills, and everything else." Mother admitted that Father offered to provide support via these texts. Mother was asked if she refused to allow Father to buy anything, and she stated: "He could have bought stuff but he never did." Father offered to buy food for the Child during the October 11th visit, but Mother stated she "ended up buying his food and [her own]." On October 28th, Father texted asking for the Child's social security number so Father could put the Child on his insurance.

Mother was asked if she had a conversation with Father via FaceBook in April of 2013, in which she told Father that he was not the Child's father. Mother stated: "I do not remember that." Some printoffs from FaceBook were produced, and Mother stated:

> This picture is of my family at the time but I don't remember sending these. He could have easily made another FaceBook and put my name in there. It's easy to do. . . . Yes you can get other people's pictures off FaceBook. . . . If you have a Mess . . . if you have a FaceBook it sends from that

---

[2] The transcript shows that Father continued to request visitation on a daily or almost daily basis until the parties wound up in court.

5

FaceBook. . . . Yes you download it with Facebook. . . . You can have . . . you can actually download that app and put anybody's FaceBook in it.

Mother denied that the FaceBook printouts were printouts of her account. Mother denied ever reporting to FaceBook that any unauthorized user had ever used her FaceBook account. Mother also admitted that she never told her friends or family members that the FaceBook conversation did not involve her.

Mother denied telling Father that Stepfather was the Child's biological father. Mother also denied showing Father a DNA test that showed that Stepfather was the Child's biological father.

Mother was asked who a James D. was, and she stated that it was her nephew. Anthony D. is Mother's sister's ex-husband. Mother was asked if she knew that a DNA test had been performed for James D. and Anthony D., and she stated: "I did not know that until I was questioned about that recently [in March of 2015]." Mother denied seeing the DNA test for James D. and Anthony D. prior to March of 2015. Mother denied showing Father a DNA test that showed that Stepfather had a 99.999% chance of being the Child's biological father. Mother further denied telling Father that he was not the Child's father during July of 2012 through November of 2013.

Representatives of the District Attorney's office sat in on portions of this trial due to allegations that Mother had taken the DNA test involving her nephew and forged or changed it to have Father's and the Child's names on it. The DNA test for Mother's nephew and his father and the one for Father and the Child are identical other than the names. These DNA test documents were admitted as exhibits.

When Mother was asked why she filed the petition to terminate Father's parental rights to the Child, she stated:

> He hadn't provided any support ever since I conceived [the Child]. We split up when I was twelve (12) months pregnant [sic]. He didn't offer to pay any doctor bills, any of my prenatal visits, any support after he was born. He didn't provide anything. He only wanted to come see him when it was okay for him. And I've . . . [Stepfather] come in and he started supporting [the Child] and they had a great relationship so I thought that [Stepfather] would be the better father for him and played the father role when he didn't.

Mother admitted that she wants Stepfather to be the Child's father. When asked if she wanted Father to be involved in the Child's life, Mother stated: "I would like for the father to be involved in a child's life but it's for his better wellbeing that he is not."

Stepfather testified that he and Mother dated from April through June of 2013. They broke up for a while and then got back together in August of 2013. Mother and Stepfather moved in together in September of 2013. Stepfather is a parts advisor for a car dealership. Stepfather submitted to a DNA test in June or July of 2013 that showed that he is not the Child's biological father.

Father testified that he lives in a house that he has owned since July of 2013. Father stated that he and Mother dated for approximately eight years. During her pregnancy with the Child, Mother and Father stopped dating for a time. Father stated: "it was questionable if the child was mine or not mine. . . . She had an affair with [Stepfather]." Mother disclosed the affair after Father questioned her about it.

Father had doubts about the paternity of the Child, but he and Mother reunited and he was there for the birth of the Child. Father was in the hospital for the delivery, and he cut the cord. Mother and Father continued to date until March of 2013. Father stated: "we were right on the line of getting married actually. We . . . it was a pretty good relationship and then I don't . . . I don't . . . it just went south real fast, you know."

Father testified that during the period from July through September of 2013, Father "bought everything, food, clothes, toys. . . . I even took care of her, helped her with her bills." Father stated that during that time Mother was working "barely, but yes." Father had no reason to keep receipts detailing what he paid for, and he did not do so. Father explained that Mother was in school fulltime and doing her clinicals so she spent a lot of time at the hospitals. When Mother was at work, at school, or at the hospitals, Father would take care of the Child.

Father discussed with Mother the question of whether he was the Child's biological father, but never requested a DNA test. Father stated: "He was mine whether he wasn't mine. That was *my* baby." Father testified that he "[a]bsolutely" wanted to be the Child's father whether he was the biological father or not. Father submitted to a DNA test in April of 2014. This DNA test showed that Father has a 99.99% chance of being the Child's biological father.

Father and Mother separated the day after the Child's first birthday. Father testified that they broke up because Mother told Father she was having an affair with Stepfather. Father was asked how close he and the Child were during the first year of the Child's life, and he stated: "UnGodly close. His first words were dad-da. I mean, it was

7

always me and him." When Father was asked if Mother's testimony that Father lived in the guest room and played video games all day was a fair characterization, he stated: "No!" Father stated that a typical day was "[j]ust me and [the Child] playing, cooking, cleaning. I mean, I'm . . . I mean, I changed his diapers. I fed him. I was always there. . . . I mean, I did not leave his side." Father stated that Mother's testimony that he did not care for the Child was "not true."

Father stated that Mother's testimony that he never supported her or the Child "is not correct." He further stated: "I'm the one that made the money. I paid the bills. I bought the food, the clothes, the toys. You name it, it came from me. Granted her mom, they bought stuff. She bought stuff. But it mostly came from me." Father testified that he bought some of the appliances in Mother's home. He testified that his mother bought them a washer and dryer, and Father left those with Mother when he moved out. Father testified: "I told her that I would buy him anything he needed, whatever so ever. I mean, I would buy *anything* for that kid."

After Father and Mother broke up in March of 2013 until July of 2013, Father was able to have some visitation with the Child, but not as much as he would have liked. Father testified that he and Mother were back together from July of 2013 to September of 2013. Father explained that he stayed with Mother at her house most of the time and would go to his house one night a week to check on it. In September of 2013, Father and Mother again broke up because Mother took the Child and disappeared with Stepfather during the Rod Runs in Gatlinburg.

An exhibit was produced that Father testified was a photo he took with his cell phone of a DNA test that Mother handed to Father ("the Document"), which shows that Father is not the biological father of the Child. Father took the photograph around the end of April. The Document states that Stepfather is the biological father of the Child. The Document shows a collection date of March 17, 2013, shows that the test was done by the Third Judicial Greeneville Court System at DDC, and shows a 99.9% probability of paternity. Father testified that Mother has or had the Document itself. Father testified that Mother handed him the Document when he went to her house and that Father left the original of the Document with Mother.

Father explained that he did not take the photograph on the day that Mother handed him the Document. He explained:

> I took it at . . . maybe a week or two weeks later after that when I was at home with my son and Comcast had to come to do a repair work on the cable cause the cable wasn't working. Whenever I moved the cable box for

> the cable guy there laid the DNA test and I took pictures of it then to send to my mother cause she wanted to see them as well.

Father testified that after he saw the Document he told his mother about it, and she expressed a desire to see the Document. Father told his mother that he would get a photograph to show her if he saw the Document again. Father asked Mother for a copy of the Document, and Mother refused to give him one.

Father testifed that he was in Mother's house on the day he took the photograph of the Document spending time with the Child. Father testified:

> Cause we were back together at that time anyways and she had to go to school that day and I was off so I was taking care of [the Child] anyway and she wanted me to be there for the Comcast guy to come in for the repair during the day.

Father testified that Mother showed him the Document after they had a conversation via FaceBook Messenger during which Mother told Father that he was not the Child's biological father. Father produced a print-off of the conversation that he had printed from his FaceBook Messenger. Father testified that after Mother showed him the Document, he believed that he was not the Child's biological father. Father, however, reunited with Mother after seeing the Document. When asked why he reunited with Mother, Father stated: "I loved her. I loved [the Child]."

At trial, it was undisputed that the Document had been altered to show that Stepfather is the biological father of the Child. The only dispute as to the Document was that Father contended Mother had it and showed it to him, and Mother denied doing so.

Father and Mother broke up again in September of 2013. After the break-up, Father requested visitations with the Child by calling and texting Mother. Father testified that he saw the Child every day from March through September, and after he and Mother broke up he continued to try to see the Child every day, but was not allowed to do so. Mother refused to allow Father to see the Child, and Mother ignored Father's texts and refused to answer his phone calls. Father testified that he has continued to request to visit with the Child since November of 2013, and his requests have been denied.

Father was not aware that James D. and Anthony D. had a paternity test "until all this started. . . . Yeah, when we discovered it in the clerk's office or whatever." Father compared the DNA test done for James D. and Anthony D. and the Document, and except for the names of the father and child and the collection date, the test results are identical.

After trial, the Trial Court entered its order on December 1, 2015, denying the petition to terminate and granting Father visitation with the Child after finding and holding, *inter alia*, that Father had not evidenced an intent to abandon his rights to the Child, that Father had made an effort to support the Child and Mother had refused to accept any support, and that Father sought visitation with the Child and Mother refused to allow Father visitation.[3]  The Trial Court found that grounds to terminate Father's parental rights were not proven by clear and convincing evidence and, therefore, properly did not address whether it would be in the Child's best interest for Father's rights to be terminated.  Mother appeals the Trial Court's order to this Court.

## Discussion

Although not stated exactly as such, Mother raises two issues on appeal: 1) whether the Trial Court erred in finding that clear and convincing evidence had not been shown of grounds to terminate Father's parental rights to the Child for abandonment by willful failure to provide support; and 2) whether the Trial Court erred in failing to find that termination is in the Child's best interest.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993).  But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250.  "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .'  Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent

---

[3] The Trial Court certified its order as a final order pursuant to Tenn. R. Civ. P. 54.02 because a petition to change the Child's surname was pending.

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights."

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[6] Tenn. Code Ann. § 36-1-113(i).

*In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Mother and Stepfather sought to terminate Father's parental rights for abandonment by willful failure to provide support pursuant to Tenn. Code Ann. § 36-1-113(g)(1), which provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2015). In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2015).

As pertinent to the issues in the case now before us, this Court has explained:

"The requirement that the failure to visit or support be 'willful' is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004–00986–COA–R3–CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005). Therefore, the element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005–00328–COA–R3–PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it

14

consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

Willfulness of a parent's conduct depends on the parent's intent, and intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoption of S.M.F.*, No. M2004–00876–COA–R9–PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id.* Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003–00186–COA–R3–CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

*In re: Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014).

In her brief on appeal, Mother argues that she proved that Father had the ability to pay support and that she also proved that Father never paid any support for the Child. In its order, however, the Trial Court found that Father had not evidenced an intent to abandon his rights to the Child, that Father had made an effort to support the Child and that Mother had refused to accept any support. Thus, the Trial Court found that Father did not willfully fail to provide support for the Child. The evidence in the record on appeal shows, as found by the Trial Court, that Father attempted multiple times to provide support, but that Mother refused to accept any support.

Mother argues in her brief on appeal that she testified that she asked Father for support and that he responded by saying "[h]e wasn't going to give me any money," and therefore, Father's failure to provide support should be considered willful. Other evidence in the record on appeal, however, including Father's testimony and exhibits

15

produced at trial, directly contradicts Mother's assertion that Father's failure to provide support was willful. The Trial Court clearly made credibility determinations when making its findings and ultimate determination regarding this issue.

> With regard to credibility, our Supreme Court has instructed:
>
> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

The evidence does not preponderate against the Trial Court's finding that Father's failure to support cannot be considered willful as Father made sincere efforts to provide support and his efforts were rebuffed by Mother. As the evidence in the record on appeal does not preponderate against the Trial Court's finding that Father did not willfully fail to provide support, Mother and Stepfather failed to prove by clear and convincing evidence grounds to terminate Father's parental rights to the Child. As grounds for termination were not proven by clear and convincing evidence, the Trial Court correctly refused to consider whether termination was in the Child's best interest. We find no error in the Trial Court's order denying the petition to terminate.

We take this opportunity to remind Mother that she and Father and not the courts chose Father, even if unintentionally, to be the Child's father. Mother cannot now change the biological paternity of the Child simply because she has married and wants her husband to be the father of her child. Nor can Mother deny Father his paternal rights simply because she desires her husband to be the father of her child. We also take this opportunity to remind the parties of how lucky the Child is to have *three* parental figures, Mother, Father, and Stepfather, who apparently love the Child and want to do what is best for him. Much too often the cases before us involve a child without any such family. We sincerely hope that these three adults will work together in the future to do what is best for the Child.

16

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Terri W.H., and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE